IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

ROBERT WILLIAM AVERY                                                    PLAINTIFF

              v.                              Civil No. 08-5091

SHERIFF KEITH FERGUSON;
CAPTAIN HUNTER PETRAY;
CORPORAL DUSTIN CARLTON;
EX-SERGEANT CHARLES TOMLIN;
and SGT. CULOTTA                                                        DEFENDANTS

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

The plaintiff, Robert William Avery, filed this civil rights action pursuant to 42 U.S.C. § 1983. He proceeds *pro se* and *in forma pauperis*.

The events at issue in this action occurred while plaintiff was incarcerated in the Benton County Detention Center (BCDC) beginning on January 16, 2007. While at the BCDC, plaintiff contends his constitutional rights were violated in numerous ways.

Defendants filed a summary judgment motion (Doc. 58). To assist plaintiff in responding to the motion, I propounded a questionnaire (Doc. 73). Plaintiff filed a response to the questionnaire within the time specified by the court (Doc. 76) (hereinafter *Resp.*). The motion is now ready for decision.

### Background

Avery was arrested on January 16, 2007. *Resp.* at ¶ 1(A). After his arrest, he was taken to the Siloam Memorial Hospital where it was determined he had a fractured rib, a facial contusion, and a right shoulder strain. *Id.* at ¶ 1(B). He was given 800 mg. of Ibuprofen to take for pain and

-1-

discharged.  *Id.*  He was then transported to the BCDC and booked in.  *Id.* at ¶ 1(C).  He was held as a pretrial detainee until June of 2008 when he was sentenced to a term of imprisonment.  *Id.* at ¶ 1(D).

On January 18th, Avery maintains he was denied due process when excessive force was used against him by Defendants Carlton, Culotta, and Tomlin.  *Resp.* at ¶ 2.  He maintains he was punished because he did not get out of bed when told to do so.  *Id.; see also* Doc. 19.  According to Avery, he was given a verbal order by the attending emergency room physician at the Siloam Springs Memorial Hospital to adhere to bed rest and to limit his activities.  *Id.* at ¶ 32(C).  Avery was charged with, and found guilty of, a disciplinary violation in connection with this incident.  He maintains he was denied due process in connection with the disciplinary proceeding.  *Resp.* at Part F.  Avery also maintains he was denied the pain medication he was prescribed by the emergency physician.  *Id.* at ¶ 33.

On February 8th, Avery requested a vegetarian tray. *Resp.* at ¶ 3(A).  He said he had been trading food but was told that if he did that he would go to the hole.  *Id.*  He stated the reason he traded food was because he didn't eat meat.  *Id.*  He indicated he was a practicing Seventh Day Adventist.  *Id.*  In response, Captain Petray stated Avery would remain on the same diet.  *Id.* at ¶ 3(B).  When he was booked in, Avery states he told the booking officer he was a vegetarian and a practicing Seventh Day Adventist.  *Id.* at ¶ 3(C).  Avery indicates a note was made of this.  *Id.*

Prior to his being booked in, Avery indicates he ate vegetarian "type dishes, egg plant, soy based vegan meats, pasta, and rice." *Resp.* at ¶ 3(D).  He states that it violates the dictates of his religion for "unclean meats . . . to polute [his] body" and he "did not eat animals who lived in their own feces." *Id.* at ¶ 3(E).

On February 10th, Avery submitted another grievance saying he was being denied his right to practice a religious belief.  *Resp.* at ¶ 4(A).  He stated he was a practicing Seventh Day Adventist and had been refused a diet because at intake he told the jailer his medical was the same as the last time he was booked in.  *Id.*  He states that when he was booked in, he was under the influence.  *Id.*  Additionally, when he was in jail on a previous occasion he indicated he traded his meat for vegetables.  *Id.*  He also states that Captain Petray on  prior occasions had authorized him to have a vegetarian tray.  *Id.*

During the incarceration at issue in this case, Avery indicates he had been told if he traded food he would be sent to the "hole."  *Id.*  In response, he was told by Captain Petray that he would remain on the same diet.  *Id.* at ¶ 4(B).

On April 24th, Avery again requested a vegetarian diet.  *Resp.* at ¶ 13(A).  He stated that he did not eat meat, fish, or poultry due to the fact that he was a Seventh Day Adventist.  *Id.*  He stated he had to go to medical due to stomach problems.  *Id.*  He asked that he please be allowed a vegetarian tray.  *Id.*  In response, he was told the doctor made medical decisions in the jail.  *Id.* at ¶ 13(B).  Avery submitted a medical request asking for a vegetarian tray.  *Id.* at ¶ 13(C).

On April 25th, Avery again asked for a vegetarian tray because of his religion.  *Resp.* at ¶ 13(D).  He stated he didn't eat any meat.  *Id.*  Despite this, Avery said he had been told not to trade the meat for other food.  *Id.*  He stated he was hungry.  *Id.*  In response, he was told he would remain on the same diet.  *Id.*

Avery received three meals a day and something to drink with each meal.  *Resp.* at ¶ 12(A).  Between meals, he had access to drinking water.  *Id.* at ¶ 12(B).  However, all meals were served cold.  *Id.* at ¶ 12(C).  He asserts the serving of cold meals was a form of punishment to make the

conditions of confinement in the BCDC as punitive as possible. *Id.* He states the BCDC had the facilities to serve hot meals. *Id.*

Avery next maintains he did not receive a diet sufficient to maintain his health. *Resp.* at ¶ 5. Specifically, he maintains the diet did not contain adequate protein. *Id.* Additionally, he states the servings were "measly" and the caloric content was inadequate to prevent wight loss and muscle deterioration as well as stomach problems. *Id.* at ¶¶ 5 & 12(C).

On March 1st, Avery stated that when he was pulled out of D-130 for court in another county his oral hygiene products were in his pocket. *Resp.* at ¶ 6(A). Avery was told to throw them out. *Id.* He asked for a replacement. *Id.* Avery asserts he did not receive replacement items for a number of days. *Id.* at ¶ 6(B).

On March 12th, Avery complained about his cell-mate and asked to have him moved before either of them got locked down for fighting. *Resp.* at ¶ 7(A). In response, Avery was told this was jail and he would follow the rules. *Id.* at ¶ 7(B).

On March 25th, Avery complained that for the last ten days or so the night shift had been provoking D-130 and locking them down for anything they could. *Resp.* at ¶ 8(A). He also noted that he was locked down for 2 ½ to three hours for "whites" to be handed out. *Id.* In response, Avery was told it would be checked on. *Id.* at ¶ 8(B). However, Avery maintains nothing changed. *Id.*

On April 3rd, Avery complained it was too hot in the pod. *Resp.* at ¶ 9(A). He asked that the air either be turned on or regulated somehow because it was so hot that inmates were sweating just sitting in the day-room. *Id.* In response, Captain Petray stated he would check with maintenance. *Id.* at ¶ 9(B). Avery asserts the temperature in the BCDC was always hot which

caused tempers and tension to be high and as a result "violence was the norm." *Id.* at ¶ 9(C).

With respect to mail, Avery maintains he was only given postage for two personal letters per week. *Resp.* at ¶ 10 & ¶ 31(A).  He asserts there were times when he was only able to send one letter because detention center personnel erroneously believed he had already sent one letter. *Id.* at ¶ 10.  Avery maintains this limitation on the number of personal letters sent violates his First Amendment rights of association. *Id.* at ¶ 31(A).

With respect to the unsanitary shaving procedures, Avery maintains numerous detainees were shaved using one electric razor that had dull blades and was not properly sanitized after each use. *Resp.* at ¶ 34.

Avery objects to being subjected to group punishment. *Resp.* at ¶ 35.  He asserts that all detainees were punished for the actions of one person. *Id.*  For instance, he states games or newspapers would be taken or withheld and phone access cut off. *Id.*  He maintains no due process was given prior to the pod being locked down. *Id.*

With respect to access to the law library, Avery indicates he was seeking access for civil and criminal issues. *Resp.* at ¶ 37(A).  He was asked whether he missed any deadlines for filing documents with the Court or was prevented from pursuing a claim because he did not have access to the library. *Id.* at ¶ 37(B).  He responded affirmatively saying that he had been denied a motion for jury trial and a motion to suppress evidence. *Id.*  He states he filed numerous grievances but they were never returned to him. *Id.* at ¶ 37(C).

Avery alleged there was no access to television or radio. *Resp.* at ¶ 39.  He said a newspaper was given out but access to it was sporadic at times. *Id.*  Additionally, he says the jailer would take the newspaper away as punishment for rule infractions. *Id.*  He indicates this is part of the group

punishment.  *Id.*

On May 5th, Avery complained the mail was not being delivered timely or properly.  *Resp.* at ¶ 16(A).  He stated he was out to court for one day and his legal mail was returned to sender even though he was only gone one day.  *Id.*  Avery also complained that mail was not given out until days after it had been received.  *Id.*

In response, Avery was told mail was distributed daily except for weekends.  *Resp.* at ¶ 16(B).  Avery was also told mail was passed out the day it was processed.  *Id.*  Finally, Captain Petray said they did not hold mail.  *Id.*

He was allowed to shower on a regular basis.  *Resp.* at ¶ 11(A).  Between showers, Avery indicates there were times he did not have any soap.  *Id.* at ¶ 11(B).  If you used all the "1" x 1 ½ bar of soap" prior to Sunday, you were without soap until then.  *Id.*  Avery also maintains inmates were only provided with a small amount of toothpaste and it usually lasted only three days leaving him without toothpaste for four days.  *Id.* at ¶ 11(E).

He had access to a toilet.  *Resp.* at ¶ 11(C).  However, from 5:00 a.m. to noon and then again from 1:00 p.m. until lock-down at 8:00 p.m., inmates were locked out of there cells.  *Id.* at ¶ 31(B).  During this period of time, he states there was only one toilet available to be shared by between thirty-two and sixty-two men.  *Id.* at ¶ 11(D).  At times, Avery asserts there would be ten men waiting to use the toilet.  *Id.* at ¶ 11(D).

Avery had a bunk or a mat to sleep on each night.  *Resp.* at ¶ 14.  Avery indicates he had to sleep on a mat that was only an inch thick.  *Id.* at ¶ 36.  He indicates the purpose of the one inch thick mat was to create an uncomfortable living environment which was punitive in design.  *Id.*

Avery assets the clothes he was given at times did not fit.  *Resp.* at ¶ 15.  As a result, he states

there were times he was forced to go without boxers or a t-shirt. *Id.*

Avery was asked whether he contended a custom, policy, or practice, was the moving force behind the violation of his federal constitutional right. *Resp.* at ¶ 17. He stated:

> It is a custom for detention staff to use un-necassary & excessive force against detainees as a form of punishment. Detainees are subjected to conditions of confinement as restrictive as those of convicted prisoners. The restrictions on the amount of mail allowed to be sent out infringes upon my 1st Amendment rights.

*Id.* at ¶ 17.

Avery was asked if he suffered any physical injury or adverse health consequences as a result of the conditions under which he was confined at the BCDC. *Resp.* at ¶ 18. He responded: "yes." *Id.* However, if he answered yes he was to describe in detail: (a) the injury or health consequences he suffered; (b) the symptoms he experienced; (c) any treatment he sought, or received; and (d) how long it took him to recover. *Id.* He was also told to attach any medical records that established the effect of the conditions of confinement on his health. *Id.* If he had no medical records to establish the adverse consequences on his health, he was told to state how he knew the conditions in which he was confined had adverse consequences on his health. *Id.* Avery did not respond to any of these questions. *Id.*

On May 17th, Avery complained that a Hispanic inmate hide a pen from staff and was not locked down. *Resp.* at ¶ 19(A). He stated a white inmate would have been treated differently. *Id.* In response, he was told the rules of the jail were enforced equally to all inmates. *Id.* at ¶ 19(B). Avery was asked if be believed white or Caucasian inmates were treated less favorably than Hispanic inmates. *Id.* at ¶19(C). He responded affirmatively and then said Caucasian inmates received more abuse and stiffer penalties for rule infractions. *Id.*

On May 18th, Avery complained his cards and pencils were missing. *Resp.* at ¶ 20. In response, he was told his cards would be replaced and to ask a pod deputy for pencils. *Id.*

On May 24th, Avery complained the oranges were not ripe. *Resp.* at ¶ 22. In response, Avery was told the oranges were fine. *Id.*

On May 27th, Avery complained that jail staff had been notified of the racial tension in D-130 on the 17th and the jailers failed to take action. *Resp.* at ¶ 21(A). He said because of this inmates were being jumped on and beaten by members of Latino gangs. *Id.* Avery indicates he was beaten in late May or early June by a Mexican male. *Id.* at ¶ 21(B). He states he received multiple bruises, lumps on his head, and bleeding from his head. *Id.* According to Avery, nothing was done to lessen racial tension in the pod. *Id.* at ¶ 21(C).

On June 30th and July 1st, Avery asked to be moved to the commit pod since he had been sentenced to a term of imprisonment at the ADC. *Resp.* at ¶ 23. In response, he was told he would stay where he was for now. *Id.*

Avery on July 2nd complained that Deputy Carlton took Avery's legal paper and envelopes after seeing his name on an amended civil complaint. *Resp.* at ¶ 27(A). Captain Petray responded that Avery and all other inmates would not be allowed to hoard excess paper or envelopes. *Id.* at ¶ 27(B). Captain Petray stated he had spoken to Deputy Carlton and he only removed excess papers and did not see his name on any complaint. *Id.*

Avery maintains paper and envelopes to mail legal paperwork were not readily available. *Resp.* at ¶ 27(C). Avery indicates distribution was at the discretion of the officers. *Id.* At times, Avery asserts it could be days before he found a officer who would supply his needs. *Id.*

On July 7th, Avery submitted a request saying his blanket and sheet were both blood covered.

*Resp.* at ¶26(A).  He asked for another set.  *Id.*  In response, Avery was told this would be checked on.  *Id.*  Avery states he was not provided with clean bedding.  *Id.* at ¶ 26(A).  If he stated he had not been provided clean bedding, Avery was instructed to state what the normal schedule was for the provision of clean bedding.  *Id.* at ¶ 26(B).  Avery elected not to provide this information.  *Id.*

On July 10th, Avery stated that his legal mail from the Eighth Circuit Court of Appeals was opened and read by someone before it was brought to him.  *Resp.* at ¶ 24(A).   In response, Avery was told at times he would receive an opened letter like that but no one was trying to read his mail or tamper with it.  *Id.*  Avery was asked how often he received legal mail that had been opened.  *Resp.* at ¶ 24(B).  He responded that he did not know.  *Id.*  However, he did recall the mail was either from the Court of Appeals for the Eighth Circuit or the United States District Court.  *Id.*  Avery has no idea who opened the mail.  *Id.*

On July 11th, Avery alleges a human tooth was found in his peanut butter.  *Resp.* at ¶ 25(A).  On other occasions, Avery maintains he found items such as plastic and cloth in his food.  *Id.*  On July 11th, Deputy Finnegan examined Avery's tray and concluded the object was a human tooth.  *Id.* at ¶ 25(B).  Deputy Finnegan looked into Avery's  mouth and noted that while he had multiple missing teeth they all appeared to have been missing for some time.  *Id.* at ¶ 25(C).  Deputy Finnegan gave Avery a new tray and took the tooth for evidence.  *Id.* at ¶ 25(D).  On July 15th, Captain Petray responded to a grievance about the tooth being in Avery's food noting that the tooth was another inmate's that Avery had placed in the food himself .  *Id.* at ¶ 25(E).  Avery, however, maintains he was not responsible for the tooth being in his food.  *Id.* at ¶ 26(F).

On August 9th, Avery asked about getting moved out of D-130. *Resp.* at ¶ 28.  He stated he had become a target.  *Id.*  In response, Avery was told he would remain as housed.  *Id.*  Avery was

asked to state: (a) how he had become a target; (b) who he was a target for; (c) whether this person ever harmed him in anyway; and (d) if Avery was harmed, he was asked to state how.  *Id.*  He responded:  "Because I kept some Latino gang members from beating a white detainee.  Latino gang members.  I was jumped in my cell at around 5:30 a.m.  I suffered brusing and swelling to my head, bac, & ribs."  *Id.*

On August 12th, Avery complained that the staff continued to force him to wear large t-shirts.  *Resp.* at ¶ 29.  He stated he was a big man and needed XL or 2XL.  *Id.*  He stated D-130 was always the last to get whites and he was forced to take the small ones.  *Id.*  In response, Captain Petray said that they gave him sizes that fit.  *Id.*

Avery submitted a number of grievances/requests asking to be moved to the commit pod.  *Resp.* at ¶ 30.  In response, Avery was told you hadn't been sentenced in Benton County yet and would remain where he was housed.  *Id.*

Avery was asked how Sheriff Ferguson violated his rights.  *Resp.* at ¶ 41.  Avery responded:

> instilling customs policy & procedures that allowed for physical & mental abuse of detainees, allowing the custom of physical abuse to contine @ the BCDC.  Allowing the conditions of pretrial detainees to become punitive in nature as if to punish one for being in jail awaiting trial.  Failing to properly train & supervise.

*Id.*  Avery asserts Captain Petray violated his rights in the same way as Sheriff Ferguson.  *Id.* at ¶ 42.

With respect to Corporal Carlton, Avery stated he violation his rights in the following ways:  "He used excessive force against me on 1-18-08.  He denied me due process before subjecting me to punishment that was in the form of a beating that left me beaten and bloody."  *Resp.* at ¶ 43.  With respect to Charles Tomlin, Avery states he violated his rights in the same way Carlton did.  *Id.* at ¶ 44.  With respect to Culotta, Avery maintains he "failed to intervene & stop defendants Carlton and

Tomlin when they were beating me.  Was also a participant in this action." *Id.* at ¶ 45.

## Summary Judgment Standard

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chem. Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a . . . verdict in their favor." *National Bank*, 165 F.3d at 607 (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." Id. (*citing Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).

## Discussion

Defendants have now moved for summary judgment.  First, defendants argue that the claims against Sheriff Ferguson and Captain Petray are in their official capacities only as they concern the operation of the facility and not any personal contact with Avery.  As there is no proof of an unconstitutional custom or policy, defendants maintain they are entitled to judgment as a matter of law.  Second, defendants argue that although Avery makes dozens of claims concerning the

-11-

conditions of confinement, an alleged denial of medical care, and an alleged denial of access to the courts by lack of access to the law library, defendants maintain he failed to bring any of these alleged complaints to the attention of the staff at the BCDC.  Third, they maintain Avery was not subjected to unconstitutional conditions of confinement.  Fourth, they assert Avery was not denied adequate medical care.  Fifth, they maintain Avery suffered no due process violations.  Sixth, they maintain Avery was not denied access to the courts.  Seventh, to the extent Avery asserts a claim based on verbal  abuse or threats, they maintain this claims fails as a matter of law.  Finally, separate defendants Carlton, Tomlin, and Culotta maintain they are entitled to qualified immunity in connection with the alleged use of force.  We will address these arguments in turn.

Section 1983 provides a federal cause of action for the deprivation, under color of law, of a citizen's "rights, privileges, or immunities secured by the Constitution and laws" of the United States. In order to state a claim under 42 U.S.C. § 1983, plaintiff must allege that the defendants acted under color of state law and that they violated a right secured by the Constitution.  *Dunham v. Wadley*, 195 F.3d 1007, 1009 (8th Cir.1999).   The deprivation must be intentional; mere negligence will not suffice to state a claim for deprivation of a constitutional right under § 1983.  *Daniels v. Williams*, 474 U.S. 327 (1986); *Davidson v. Cannon*, 474 U.S. 344 (1986).

### I.  *Official Capacity and Individual Capacity Claims*

Under § 1983, a defendant may be sued in either his individual capacity, or in his official capacity, or in both.  In this case, on September 11, 2008, an order was entered (Doc. 18), granting in part a motion to amend filed by Avery.  The order specifically granted the part of the motion in which Avery specified he was suing each defendant in both his official and individual capacity.  The clerk was directed to note on the docket sheet that each defendant was sued in their individual and

-12-

official capacity.

## II.  *Unconstitutional Policy, Custom, or Practice*

Defendants argue that there is no proof of an unconstitutional custom or policy and they are entitled to judgment as a matter of law in their favor.  A suit against an a public official in his official capacity is actually a suit against the entity for which the official is an agent.  *Parrish v. Ball*, 594 F.3d 993, 997 (8th Cir. 2010).  A plaintiff may impose liability on a governmental entity only if the alleged unconstitutional conduct implements official policy or widespread custom or practice of unconstitutional conduct.  *Monell v. Department of Social Services,* 436 U.S. 658, 694 (1978).  In this case, Avery has alleged the existence of a number of policies or customs that he maintains were the moving force behind the constitutional injuries he alleges.  Thus, before the court can determine whether there are genuine issues of material fact as to the existence of an official capacity claim, we must examine the asserted by Avery.

## III.  *Exhaustion of Administrative Remedies*

Defendants maintain Avery did not submit grievances regarding his conditions of confinement claims, his denial of medical care claims, or his access to the law library claims.  Avery maintains he submitted multiple grievances and he complained that he was not receiving responses to his grievances.

The summary judgment record establishes that Avery submitted a number of grievances and/or requests raising various topics including the use of excessive force, racial tension in the pod, the temperature in the pod being too hot, complaints about the diet and portions he was receiving, complaints about not receiving a vegetarian diet in keeping with the dictates of his religion, a foreign object being found in his food, complaints about his legal mail being taken out of his cell and the

-13-

mail not being delivered timely, unsanitary restrooms and shaving equipment, not being allowed to sleep during the day, not receiving responses to his grievances, being served cold food, and being forced to wear large shirts instead of extra large. Avery also maintains he never received copies of other grievances. Supplement to Defendants' Exhibits 4 (Doc. 71); Exhibits to Plaintiff's Resp. (Doc. 76). We cannot say Avery failed to exhaust his administrative remedies.

**IV.** *Conditions of Confinement*

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *County of Sacramento v. Lewis*, 523 U.S. 833 (1998)(citation omitted). The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994).

The Eighth Amendment to the United States Constitution prohibits the imposition of cruel and unusual punishment. U.S. Const. amend. VIII. *See also Butler v. Fletcher*, 465 F.3d 340, 345 (8th Cir. 2006)(deliberate indifference standard of the Eighth Amendment applies to all claims that prison officials failed to provide adequate food, clothing, shelter, etc., whether brought by pretrial detainees or convicted inmates). The Cruel and Unusual Punishment Clause of the Eighth Amendment forbids conditions that involve the "wanton and unnecessary infliction of pain," or are "grossly disproportionate to the severity of the crime." *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S. Ct. 2392, 69 L. Ed. 2d 59 (1981).

A prisoner alleging an Eighth Amendment violation must prove both an objective and subjective element. *See Revels v. Vincenz*, 382 F.3d 870, 875 (8th Cir. 2004)(*citing Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). "The defendant's conduct must objectively rise to the level of a

-14-

constitutional violation by depriving the plaintiff of the minimal civilized measure of life's necessities. The defendant's conduct must also reflect a subjective state of mind evincing deliberate indifference to the health or safety of the prisoner" *Revels*, 382 F.3d at 875 (citations and internal quotation marks omitted). Deliberate indifference is established when the plaintiff shows "the defendant was substantially aware of but disregarded an excessive risk to inmate health or safety." *Revels,* 382 F.3d at 875. The standards against which a court measures prison conditions are "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble*, 429 U.S. 97, 102 (1976).

Keeping these principles in mind, I turn to an examination of the conditions of confinement alleged to exist in this case. Here, Avery asserts the following conditions are unconstitutional: being restricted to two personal letters per week; mail not being promptly delivered; eating cold food three times a day; the diet was inadequate; having to share one toilet with thirty-two to sixty-two men during the morning and afternoon hours while locked out of their cells; being force to stay out of his cell during the morning and afternoon hours despite having been injured; being forced to remain in the pod despite fears of possible racial violence; refusal of pain medication prescribed at the hospital; inadequate hygiene products; unsanitary shaving procedures; group punishment; and being forced to sleep on a one inch thick mat.[1]

### (A). Limitations on, Delivery of, and Opening of the Mail

Inmates have a First Amendment right of free speech to send and receive mail. *Hudson v. Palmer*, 468 U.S. 517, 547 (1984). "The fact of confinement and the needs of the penal institution

---

[1] Avery originally alleged the exercise facilities were inadequate and it was improper for defendants to record his personal phone calls. He has decided not to pursue these claims. *See Resp.* at ¶¶ 38 & 40.

impose limitations on constitutional rights, including those derived from the First Amendment."
*Jones v. North Carolina Prisoners' Union*, 433 U.S. 119, 125 (1977).  Restrictions on this First
Amendment right are valid "only if it is reasonably related to legitimate penological interests."
*Turner v. Safely*, 482 U.S. 78, 89 (1987).  "[E]conomic factors may . . . be considered . . . in
choosing the methods used to provide meaningful access.  But the cost of protecting a constitutional
right cannot justify its total denial."  *Bell-Bey*, 87 F.3d at 838 (*citing Bounds v. Smith*, 430 U.S. 817,
824-25 (1977)).  When a policy regulates outgoing mail, the policy must "'further an important or
substantial government interest unrelated to the suppression of expression,' and must not limit First
Amendment freedoms 'greater than is necessary or essential to the protection of the particular
governmental interest involved.'"  *Bell-Bey*, 87 F.3d at 838 (*quoting Procunier v. Martinez*, 416 U.S.
396, 413, 94 S. Ct. 1800, 40 L. Ed. 2d 224 (1974)).

Here, Avery does not contend there was a general limitation placed on the number of legal
or personal letters an inmate could mail at his own expense.  Nor does he challenge a regulation that
places a specific limit on the amount of postage available to indigent prisoners for legal mail.
Instead, he objects to the limitation on free postage for personal letters, alleged delays in mail
delivery, and the opening of an item of mail from the United States Court of Appeals for the Eighth
Circuit or from the United States District Court.

Inspection procedures, such as scanning legal mail for docket numbers, case titles, requests
for documents, etc., that are limited to determining if the mail in question constitutes legal mail have
been upheld.  *See e.g., Bell-Bey v. Williams*, 87 F.3d 832, 836-838 (6th Cir. 1996).  While Avery
maintains an item, or perhaps items, *Resp.* at ¶ 24(B),  of legal mail were opened, he does not
contend anything was removed from the mail, or that the mail was read or otherwise interfered with.

He has not suggested there was any ongoing practice of censorship or that the application of any policy resulted in the alleged interference. *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003)(Plaintiff must show regular and unjustifiable interference-- an isolated incident of mail tampering is usually insufficient to establish a constitutional violation); *Zimmerman v. Tribble*, 226 F. 3d 568, 572 (7th Cir. 2000)(allegations of sporadic and short-term delays and disruptions are insufficient to state a claim under the First Amendment); *Rowe v. Shake*, 196 F.3d 778, 782-783 (7th Cir. 1999)(relatively short-term and sporadic delays in receiving mail not the result of content-based prison regulation or practice is insufficient to state a First Amendment claim).  Defendants are therefore entitled to summary judgment on this claim.

### (B) Cold Food, Foreign Objects in Food, and Inadequate Caloric Content

"Constitutional standards require only that prison authorities provide an inmate with well-balanced meals, containing sufficient nutritional value to preserve health." *Berry v. Brady*, 192 F.3d 504, 507 (5th Cir. 1999)(internal quotation marks and citation omitted).  The provision of only cold food does not violate the Constitution.  *See Brown-El v. Delo*, 969 F.2d 644, 648 (8th Cir. 1992)("We agree with the district court that Brown-El's claim that his constitutional rights were violated when he was served cold food is frivolous."); *Hamm v. DeKalb County*, 774 F.2d 1567, 1575 (11th Cir. 1985)(Food that "occasionally contains foreign objects or sometimes is served cold, while unpleasant, does not amount to a constitutional deprivation."); *Waring v. Meachum*, 175 F. Supp. 2d 230, 239 (D. Conn. 2001)("The provision of cold food is not, by itself, a violation of the Eighth Amendment as long as it is nutritionally adequate and is 'prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it.'"); *Smith v. Copeland*, 892 F. Supp. 1218, 1229 (E.D. Mo. 1995)(holding that diet

-17-

of only cold food, in and of itself, does not offend the Constitution), *aff'd,* 87 F.3d 265 (8th Cir. 1996).

Next, Avery argues that his rights were violated when on one occasion a tooth was found in his peanut butter and other items such as plastic or cloth were on occasion found in his food.  These isolated incidents do not state a claim of constitutional dimension. *See e.g., Wishon v. Gammon*, 978 F.3d 446, 449 (8th Cir. 1992)("[P]risoners have a right to nutritionally adequate food; however, Wishon has presented no evidence that the food he was served was nutritionally inadequate or prepared in a manner presenting an immediate danger to his health, or that his health suffered as a result of the food"); *Hamm v. DeKalb County*, 774 F.2d 1567, 1572 (11th Cir. 1985)("The fact that the food occasionally contains foreign objects . . . does not amount to a constitutional deprivation"). *See also Lunsford v. Reynolds*, 376 F. Supp. 526, 527 (W.D. Va. 1974)("The only contention concerning food which is detailed at all, is the inmates' complaint that their food frequently contains insects.  Nevertheless, occasional incidents of a foreign object contained in food, while regrettable, does not present a question of constitutional proportion").

Avery also argues the diet was inadequate to sustain health.  The Eighth Amendment's prohibition against cruel and unusual punishment is violated if an inmate is not provided with meals adequate to maintain his health.  *See e.g., Keenan v. Hall*, 83 F.3d 1083, 1091 (9th Cir. 1996); *Campbell v. Cauthron*, 623 F.2d 503, 508 (8th Cir. 1980)(prisoners are guaranteed a reasonably adequate diet).  Merely because the food is not prepared to an inmate's taste or the fact that an inmate would prefer other foods does not implicate the Eighth Amendment.  Rather, the Eighth Amendment is only violated if the food provided is inadequate to maintain good health.  *See e.g., Burgin v. Nix*, 899 F.2d 733, 734-35 (8th Cir. 1990)(inmates do not have a right to be served a particular type of

food).

"The deprivation of food constitutes cruel and unusual punishment only if it denies a prisoner the 'minimal civilized measure of life's necessities.'" *Talib v. Gilley*, 138 F.3d 211, 214 n. 3 (5th Cir. 1998)(expressing doubt that Talib who missed about fifty meals in five months and lost fifteen pounds met this threshold)(*quoting Wilson v. Seiter*, 501 U.S. 294, 298 (1991)).  "Whether the deprivation of food falls below this threshold depends on the amount and duration of the deprivation." *Green v. Ferrell*, 801 F.2d 765, 770 (5th Cir. 1986)(even on a regular permanent basis, two meals a day may be adequate).  *See also Berry v. Brady*, 192 F.3d 504, 507 (5th Cir. 1999)(claim that inmate missed eight meals properly dismissed as frivolous); *Cunningham v. Jones*, 667 F.2d 565, 566 (6th Cir. 1982)(Eighth Amendment not violated when inmate served only one meal a day for fifteen consecutive days where the one meal was sufficient to maintain normal health).

Here Avery received three meals a day.  While Avery states the diet did not contain enough caloric content and therefore could cause weight loss, muscle deterioration, and stomach issues, *Resp.* at ¶ 5, when he was asked to describe the adverse health consequences he suffered he did not respond, *Resp.* at ¶ 18.  Moreover, Avery indicates he was trading food and not eating any of the meat on his tray.

### (C) Religious Diet

Avery asked on repeated occasions for a vegetarian diet because he was a practicing Seventh Day Adventist.  This implicates Avery's First Amendment Rights rather than his Eighth Amendment rights.  The First Amendment may be violated if an inmate is not served food that meets the dictates of his religion.  In cases involving religious dietary restrictions, an inmate must be provided with an adequate diet that does not violate the inmate's religious beliefs.  *See e.g., McElyea v. Babbitt*, 833

-19-

F.2d 196, 198 (9th Cir. 1987)(inmates entitled to diet sufficient to sustain health and satisfy religious dictates).

As noted above, in Avery's case, he contends his First Amendment right to free exercise of religion was violated because he was "denied" a vegetarian diet.  Clearly each of Avery's requests were turned down.  On the record before the court, there are issues of fact as to whether defendants substantially burdened Avery's exercise of his religious beliefs.  *See Love v. Reed*, 216 F.3d 682, 689 (8th Cir. 2000)(inmates are entitled to reasonable accommodation of religious dietary needs).

### (D) Sharing of Toilet Facilities and Locked Out of the Cell

Avery maintains that during the morning and afternoon when all inmates were locked out of their cells that between thirty-two and sixty-two inmates were forced to share one toilet.  At times, he asserts there would be ten inmates in line waiting to use the toilet.  The longest period of time he had to wait to use the toilet was forty-five minutes.  *Resp.* at ¶ 11(D).  Avery has not alleged that he suffered any physical harm as a result of the fact that there were times he had to wait to use the bathroom.  The "deprivation of the right to use the bathroom" for short periods of time, "in the absence of physical harm or a serious risk of contamination, does not rise to the level of an Eighth Amendment violation."  *Revels v. Vincenz*, 382 F.3d 870, 875 (8th Cir. 2004).

Avery also maintains he should not have been locked out of his cell during the morning and afternoon hours because when he was booked into the jail he had physical injuries.   While this is true, the written discharge papers did not put Avery on bed rest.  *Defts' Ex.* 3.  Nor is there any evidence or argument that Avery was put on bed rest by the jail doctor.

### (E) Unsafe Environment--Fears of Possible Racial Violence

According to Avery, on May 17, 2007, jailers were notified of the racial tension in D-130.

Avery contends the jailers failed to take action and because of this inmates were being jumped on and beaten by members of Latino gangs. *Resp.* at ¶ 21(A). Avery maintains he was jumped on during late May or early June and received multiple bruises, lumps on, and bleeding from his head. *Id.* at ¶ 21(B). He states he was assaulted by a Mexican male. *Id.*

"The eighth amendment's prohibition against cruel and unusual punishment requires prison official to take reasonable measures to guarantee inmate safety by protecting them from attacks by other prisoners. Prison officials act unreasonably--thereby violating the Eighth Amendment--when they are deliberately indifferent to a substantial risk of serious harm." *Nelson v. Shuffman*, 603 F.3d 439, 446 (8th Cir. 2010)(internal quotation marks and citation omitted). Defendants have not addressed this claim in their summary judgment motion. We therefore conclude genuine issues of fact exist on this claim.

**(F) Inadequate Hygiene Products, Inability to Shave, Unsanitary Shaving Procedures**

Avery alleges hygiene supplies were distributed once a week and there were times his supply was exhausted before the end of the week. "[R]epeated deprivation of hygiene supplies violates inmates' Eighth Amendment rights." *Myers v. Hundley*, 101 F.3d 542, 544 (8th Cir. 1996)(citation omitted). In this case, Avery does not contend he was denied hygiene supplies or that he was repeatedly unable to maintain his personal hygiene at an appropriate level. No Eighth Amendment claim is stated.

While Avery states he was not able to shave or cut his hair when he wanted to, these rules did not deprive him of a single identifiable need. Additionally, he has not alleged that he suffered any adverse health consequences or physical injury because use the razor was not sanitized between uses. "[E]xtreme deprivations are required to make out a conditions-of-confinement claims. [O]nly

-21-

those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Hudson*, 112 S. Ct. at 1000; *Myers v. Hundley* 101 F.3d 542, 544 (8th Cir. 1996); *Howard v. Adkison*, 887 F.2d 134, 137 (8th Cir. 1989).  Avery's allegations are clearly insufficient.

   **(G) Group Punishment**

   Avery also maintains the defendants engaged in unconstitutional  "group punishment" when they would shut off the phones, take away games and newspapers, and would lock down the pod early because of the conduct of a few inmates.  We find this argument to be without merit.  Prison officials are permitted to take measures to preserve the security and safety of the facility and it employees, to control the inmates, and to preserve the safety and security of the inmates.  *See e.g., Johnson v. Williams*, 788 F.2d 1319 (8th Cir. 1986).  The measures taken by defendants, while they may have been disagreeable to the inmates, did not violate the Eighth Amendment.  *See e.g., Howard v. Adkison*, 887 F.2d 134, 137 (8th Cir. 1989)(Eighth Amendment claim evaluated in terms of whether the conduct was "so inhumane, base or barbaric so as to shock the sensibilities.").

   **(H) Refusal to Obey the Doctor's Orders**

   Avery maintains the emergency room doctor he saw verbally ordered bed rest for Avery.  He also maintains he did not receive the Ibuprofen ordered.  The records from Avery's emergency room visit contain no order for bed rest.  Avery did not ask that the verbal order be verified with the emergency room doctor.  He did not ask to see the jail nurse or doctor to be placed on bed rest. "Section 1983 liability is personal."  *Dahl v. Weber*, 580 F.3d 730, 733 (8th Cir. 2009).  To recover against the defendants, Avery must establish that they were either personally involved in, or directly responsible for the alleged constitutional violation.  *Id.*  There is no indication in the record that any

-22-

of the named defendants were involved in denying Avery medication or involved in anyway with the provision of medical care at the BCDC.

### (I) Forced to Sleep on a One Inch Mat & Inadequate Clothing

Avery asserts that being forced to sleep on a mat an inch thick and being provided with large t-shirts instead of extra large t-shirts violated his constitutional rights. We disagree. Clearly, this did not deprived of "a single, identifiable human need, such as food, warmth or exercise." *Whitnack v. Douglas County*, 16 F.3d 954, 957 (8th Cir. 1994).

### V. *Denial of Access to the Law Library*

Avery contends he was denied access to the law library because he was represented by counsel in his criminal case. He indicates he asked to use the library in connection with both civil and criminal cases. As a result of not having access, he states he was unable to file a demand for jury trial and was unable to file a motion to suppress.

"Inmates undeniably enjoy a constitutional right of access to the courts and the legal system." *Myers v. Hundley*, 101 F.3d 542, 544 (8th Cir. 1996)(*citing*, *Lewis v. Casey*, 518 U.S. 343 (1996); *Bounds v. Smith*, 430 U.S. 817, 821 (1977)). In *Myers*, the Eighth Circuit stated that:

> [t]o protect that right, prisons must provide inmates with some access to legal materials or to legal assistance so that inmates can prepare and pursue complaints, and with some ability to mail these complaints and related legal correspondence once prepared. Inmates do not have a right, however, either to law libraries or to unlimited stamp allowances for legal mail. Instead, the duty to make such arrangements is bounded by the inmates' right of meaningful access to the courts. To state a claim that a law library or legal assistance program violates this right, inmates must assert that they suffered an actual injury to pending or contemplated legal claims. Alleging theoretical inadequacies is insufficient. Inmates must instead show, for example, that a complaint that they prepared was dismissed due to a technical requirement that a library's inadequacies prevented them from knowing, or that a library was so inadequate that it prevented them from filing a complaint for actionable harm at all.

-23-

*Myers*, 101 F.3d at 544 (citations omitted).

In *Cody v. Weber*, 256 F. 3d 764 (8th Cir. 2001), the Eighth Circuit noted that the Supreme Court in *Lewis v. Casey*, 518 U.S. 343 (1996) and *Bounds v. Smith*, 430 U.S. 817 (1977), "determined that the right of access to the courts guarantees an inmate the ability to file lawsuits that directly or collaterally attack the inmate's sentence or that challenge the conditions of the inmate's confinement, but it does not extend to the right to 'discover grievances' or to 'litigate effectively once in court.'" *Cody*, 256 F. 3d at 767-68 (*quoting Lewis*, 518 U.S. at 354-55).

Clearly, Avery's claim is based on his alleged inability to effectively litigate once in court. Avery makes no argument that he was prevented from sending legal mail. He makes no argument that he was prevented from mailing a demand or motion for jury trial or that he could not have filed a motion to suppress if his counsel refused to do so.

### VI. *Due Process in Connection with the January 18, 2007, Incident*

On January 18, 2007, Avery maintains he was denied due process when Corporal Carlton and Charles Tomlin pulled him from his bunk and inflicted excessive force against him because he did not obey an order. He also contends Sgt. Culotta is liable because he failed to intervene to protect Avery and participated in the event. He maintains their actions were entirely punitive in nature. Finally, he maintains he was denied due process in connection with the disciplinary proceeding.

However, Avery's excessive force claim arising from this same event was the subject of a separate claim asserted in *Avery v. Ferguson*, Civil No. 07-5111. Thus, in this case Avery is limited to his assertion that he was denied due process in connection with the disciplinary proceeding. In this regard, he argues: (1) there is a discrepancy in the disciplinary action report, which indicates Avery had nothing to say in his defense, *Plff's Ex.* 61, and the incident report in which Avery is

-24-

noted to have said he was on bed rest, *Plff's Ex.* 50; (2) he was locked down, charged with a disciplinary offense, and found guilty of the disciplinary violation, all within fifteen minutes giving him no time to collect evidence or otherwise prepare in his defense; (3) he was unable to call Deputy Matthew West, the officer who took Avery to the emergency room, as a witness; (4) he was not provided with a written statement recounting the evidence relied on by the disciplinary decision maker and the reasons the disciplinary action was taken; and (5) he was denied the right to a sufficiently impartial decision maker because Defendant Tomlin was involved in the incident and served as the decision maker.

Under the Due Process Clause of the United States Constitution, a pretrial detainee may not be punished prior to an adjudication of guilt. *See Bell v. Wolfish*, 441 U.S. 520, 535, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979). He "cannot be placed in segregation as a punishment for a disciplinary infraction without notice and an opportunity to be heard; due process requires no less." *Higgs v. Carver*, 286 F.3d 437, 438 (7th Cir. 2002).

"The Supreme Court has outlined the procedures correctional facilities must follow to conduct an impartial due process hearing on a disciplinary matter." *Hartsfield v. Nichols*, 511 F.3d 826, 830 (8th Cir. 2008)(*citing Wolff v. McDonnell*, 418 U.S. 539, 563-66 (1974)). These procedures include written notice of the charges, a brief period to prepare, a written statement of the evidence relied on and reasons for the disciplinary action, and the ability for the inmate to call witnesses and present documentary evidence. *Id. See also Dible v. Scholl*, 506 F.3d 1106, 1110 (8th Cir. 2007).

An impartial disciplinary committee may find a detainee guilty if it finds some evidence upon which to base the disciplinary violation. *Hartsfield*, 511 F.3d at 831. In fact, the Eighth Circuit has noted that

disciplinary actions may be taken–and often they are–based *only on a guard's report. Even when there is substantial evidence to the contrary, the committee may find a guard's report to be credible* and therefore take disciplinary action.  However, the *Wolff* hearing ensures that the inmate has an opportunity to persuade an impartial decisionmaker, who must give written justification for his decision that discipline is not warranted.  This is the interest protected by the Constitution.

*Hartsfield*, 511 F.3d at 831 (*quoting Hrbek v. Nix*, 12 F.3d 777, 781 (8th Cir. 1993)).

In this case, the disciplinary action form was served on Avery on January 18th.  *Plff's Ex.* 51.  The decision maker was Sgt. Tomlin who was involved in the incident that formed the basis of the disciplinary charge.  *Plff's Ex.* 49.  The only comment written in the area on the form for the details of the hearing is:  "Nothing to say."  *Plff's Ex.* 51.  In the area for the hearing officer's findings, the only thing written is:  "10 days L/D."  *Id.*  The decision was upheld that day.  *Id.*  Clearly there are issues of fact as to whether Avery was denied the procedural protections afforded by *Wolff.*

**VII.  *Access to Newspapers or Other Media Sources***

Avery maintains there is no access to television or radio at the BCDC.  While newspapers are given out, Avery maintains access to them is sporadic and at times the jailers took the newspapers away as punishment for rule infractions.

"Prison walls do not form a barrier separating prison inmates from the protections of the Constitution."  *Thornburgh v. Abbott*, 490 U.S. 401, 407 (1989).   "[A] prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system."  *Pell v. Procunier*, 417 U.S. 817, 822 (1972).  Among other things, the "Constitution protects the rights to receive information and ideas."  *Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972).

Prison policies impinging on inmates'  First Amendment rights are valid only if they are

-26-

reasonably related to legitimate penological interests. *Turner v. Safley*, 482 U.S. 78, 89-90 (1987); *Cooper v. Schriro*, 189 F.3d 781, 784 (8th Cir. 1999).   "[E]ven though this court engages in a deferential review of the administrative decisions of prison authorities, the traditional deference does not mean that courts have abdicated their duty to protect those constitutional rights that a prisoner retains." *Fortner v. Thomas*, 983 F.2d 1024, 1029 (11th Cir. 1993).

In determining whether a regulation or restriction is reasonable, the court employs a balancing test considering:  (1) whether a rational connection exists between the regulation and a neutral, legitimate government interest; (2) whether alternative means exist for inmates to exercise the constitutional right at issue; (3) what impact the accommodation of the right would have on inmates, prison personnel, and allocation of prison resources; and (4) whether obvious, easy alternatives exist. *See Beard v. Banks,* 548 U.S. 521, 522-23 (2006)(applying *Turner* and upholding a Pennsylvania prison policy denying newspapers, magazines and photographs to a group of "specifically dangerous and recalcitrant inmates.").

It has been held that "[t]here is no basis for total restrictions on prisoners' access to the news in view of their clear First Amendment rights."  *United States ex rel. Manicone v. Corso*, 365 F. Supp. 576, 577 (E.D. N.Y. 1973).  Furthermore, a number of courts have held that prisoners have a right to receive and read newspapers.  *See e.g, Sizemore v. Williford*, 829 F.2d 608, 610 (7th Cir. 1987) (absent restrictions based on legitimate goals of confinement, prison inmates retain First Amendment right to receive and read newspapers); *Mann v. Smith*, 796 F.2d 79, 82-83 (5th Cir. 1986)(county jail's policy of banning newspapers and magazines violated a pretrial detainee's First Amendment rights where the state failed to show the ban served a legitimate government objective); *Wilkinson v. Skinner*, 462 F.2d 670, 673 n. 5 (2nd Cir. 1972)("refusal to deliver a newspaper would

ordinarily be interference with appellant's first amendment rights"); *Rowland v. Jones*, 452 F.2d 1005 (8th Cir. 1971)(prison authorities' denial of access to newspaper "Muhammad Speaks" constituted prior restraint in violation of First Amendment); *Spellman v. Hopper*, 95 F. Supp. 2d 1267 (M.D. Ala. 1999)(absolute prohibition on subscription magazines and newspapers applied to administrative segregation inmates in Alabama is not reasonably related to legitimate penological goals).

Here, defendants have not addressed this claim. The court therefore has no information on which to determine whether or not Avery had access to a news media source on more than a sporadic basis and whether or not the newspapers were taken away from inmates in furtherance of legitimate penological interests.

## Conclusion

For the reasons stated, I recommend that defendants' motion for summary judgment (Doc. 58) be granted in part and denied in part. Specifically, I recommend the motion be denied with respect to the following claims: (1) Avery's claim that he was denied a religious diet in violation of his First Amendment; (2) his claim that he was subjected to an unsafe, racially charged, environment; (3) his claim that his due process rights were violated in connection with the January 18, 2007, disciplinary proceedings; and (4) his claim that First Amendment rights were violated when he did not have access to newspapers or any other media sources. In all other respects, I recommend that the motion for summary judgment be granted.

**The parties have fourteen (14) days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are**

-28-

reminded that objections must be both timely and specific to trigger de novo review by the district court.

**DATED** this **3rd day of September 2010.**

/s/ *J. Marschewski*

HON. JAMES R. MARSCHEWSKI
CHIEF UNITED STATES MAGISTRATE JUDGE